UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
YVONNE and CHARLES HARVEY,

                Plaintiffs,

      - against -

HOME SAVERS CONSULTING CORP.,
GARTH CELESTINE, PHIL SIMON,
OPHELIA RAY, KRISHNA MAHARAJ,
COURTNEY CALLENDER, BLACKACRE
TITLE AGENCY CORP., NEW YORK
MORTGAGE CO. LLC, MARVIN BLAKELY,
RMS RESIDENTIAL PROPERTIES LLC, et al.,

                Defendants
--------------------------------------------------X
GOLD, S., *United States Magistrate Judge*:

REPORT AND
RECOMMENDATION
07-CV-2645 (JG)


## **Introduction**

       Plaintiffs, Yvonne and Charles Harvey, bring multiple claims pursuant to New York Real

Property Law § 320, the Truth in Lending Act ("TILA") and the Home Ownership and Equity

Protection Act ("HOEPA"), 15 U.S.C. § 1601 *et seq.*, the Real Estate Settlement Procedures Act

("RESPA"), 12 U.S.C. § 2601 *et seq.*, the Racketeer Influenced and Corrupt Organizations Act

("RICO"), 18 U.S.C. § 1961 *et seq.*, the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, the Civil

Rights Acts, 42 U.S.C. §§ 1981, 1982, and the New York Deceptive Practices Act, N.Y. Gen.

Bus. Law § 349.  Plaintiffs also press claims for common law fraud, civil conspiracy to commit

fraud, and conversion.

       Plaintiffs have settled with all defendants except for the Home Savers Consulting

Corporation ("Home Savers"), Garth Celestine, and Phil Simon, (collectively "the Home Savers

Defendants"), and Marvin Blakely.   Plaintiffs seek a judgment against these remaining

defendants for damages resulting from defendants' fraudulent mortgage foreclosure "rescue" scheme in an amount totaling $1,353,929.11, plus pre- and post-judgment interest, and reasonable attorney's fees and costs. Upon plaintiffs' application and in light of these defendants' failure to appear or otherwise defend this action, the Clerk of the Court noted the default of defendants Celestine on January 31, 2008 (Docket Entry 35), Home Savers on February 5, 2008 (Docket Entry 37), and Blakely on March 17, 2008 (Docket Entry 56). On November 25, 2009, the Honorable John Gleeson adopted my Report and Recommendation (Docket Entry 136), recommending that default be entered against defendant Simon for his failure to appear for a deposition. Judge Gleeson has now referred the matter to me to report and recommend on the amount of damages to be awarded against the defaulting defendants.[1] For the following reasons, I respectfully recommend that plaintiffs' motion be granted in part and denied in part.

## Background

Plaintiffs, African Americans, reside in a house located at 131 Alaska Street, Staten Island, New York. Second Am. Compl. ("Compl."), Docket Entry 25, ¶ 10. In May of 2006, plaintiffs entered into a transaction structured by defendant Home Savers, a New York corporation. Compl. ¶¶ 11, 70. Garth Celestine is the president of Home Savers, Phil Simon is a manager, and Marvin Blakely is an attorney employed by or associated with Home Savers. Compl. ¶¶ 13, 16, 25.

---

[1] Judge Gleeson referred this matter to me by Orders entered on March 6, 2008, March 18, 2008, and November 25, 2009. Since only some of the defendants were in default, I deferred a determination of damages until all of the defendants' liability could be adjudicated in order to avoid the prospect of inconsistent judgments. Docket Entry 55. (citing *Lawrence v. Vaman Trading Co.,* 1993 WL 190266, at *2 (S.D.N.Y. May 28, 1993) (noting that courts have consistently delayed damages inquests where a plaintiff seeks joint and several liability in order "to avoid the problems of dealing with inconsistent damage determinations") (internal quotations omitted)). Now that all of the other defendants have settled, plaintiffs have renewed their motion for default judgment against the remaining defaulting defendants. Docket Entry 148.

Plaintiffs purchased their house in 1992. Compl. ¶ 41. To acquire the home, plaintiffs made a $10,000 down payment and took out a mortgage for $94,500. Compl. ¶ 42. Over the next eleven years, plaintiffs refinanced their home a number of times, and eventually took a mortgage from BNC Mortgage, Inc. ("BNC") that carried a principle balance of $170,000, an adjustable rate of 6.75%, and a monthly payment of approximately $1,200 per month. Compl. ¶ 43. On July, 27, 2004, BNC assigned plaintiffs' mortgage to LaSalle Bank National Association ("LaSalle"), a subsidiary of Option One Mortgage. Compl. ¶¶ 44-45.

Sometime in early 2004, Mrs. Harvey stopped receiving her Social Security Disability benefits, causing plaintiffs to fall behind on their mortgage payments. Compl. ¶ 46. LaSalle commenced foreclosure proceedings on July 16, 2004. Compl. ¶ 47. On January 30, 2006, after plaintiffs had unsuccessfully attempted to prevent foreclosure through a Chapter 13 bankruptcy, LaSalle obtained a judgment against the plaintiffs in the amount of $183,349.16. Compl. ¶¶ 48-50. A foreclosure sale was scheduled for April 3, 2006. Compl. ¶ 51.

In March of 2006, an employee of defendant Home Savers named Ophelia Ray telephoned plaintiffs. Compl. ¶ 52. Ms. Ray claimed that Home Savers could save plaintiffs' home by arranging for a refinancing transaction in which plaintiffs would take out another mortgage and use the equity currently built up in their home to pay off their defaulted LaSalle mortgage. Compl. ¶¶ 52, 57-59. Plaintiffs declined Ray's offer. Compl. ¶ 53. Soon after, Ray appeared personally at plaintiffs' door, this time with a second Home Savers representative, proclaiming a sincere desire to help plaintiffs and avowing a religious motivation. Compl. ¶¶ 54-56.

On March 30, 2006, plaintiffs visited Home Savers' office at 946 Fulton Street, Brooklyn, New York and met with defendant Celestine. Compl. ¶ 60. Celestine reiterated Ray's

statements and explained that Home Savers could arrange for a mortgage refinancing that would allow plaintiffs to keep their home by using their accumulated equity. Compl. ¶¶ 60-63. Celestine provided plaintiffs with documents displaying Home Savers letterhead with the slogan "Helping You Keep What's Yours." Compl. ¶ 62. Celestine told plaintiffs he could arrange for a mortgage with a $250,000 principle balance and save plaintiffs' home from foreclosure. Compl. ¶¶ 61-63. Plaintiffs agreed to this proposal. Compl. ¶ 65.

Plaintiffs allege that Home Savers was not a legitimate business but rather a front for defendants' vast foreclosure rescue scheme. Compl. ¶¶ 2-4, 173-193; Albert Decl. Ex. 15 at 23-26. Defendants targeted home owners who had accumulated significant equity in their homes but were nonetheless struggling to meet their mortgage obligations. *Id.* While falsely promising to help save their victims' homes, defendants in fact deceived their victims into entering transactions which transferred away the title to their homes and stripped them of their equity. *Id.* Starting from as early as 2004 and continuing through 2007, defendants engaged in dozens of similar transactions, generating millions of dollars and spawning numerous lawsuits. Compl. ¶¶ 173-192 (discussing *Phifer v. Home Savers Consulting Corp.*, 2007 WL 295605 (E.D.N.Y. Jan. 30, 2007) and *Johnson v. Home Savers Consulting Corp.*, 2007 WL 925518 (E.D.N.Y. March 20, 2007)). Defendants specifically targeted African-American neighborhoods, such as the one where plaintiffs reside, by advertising in publications with a readership that was primarily African-American and limiting telephone and door-to-door solicitation to those neighborhoods. Compl. ¶¶ 198-204.

On March 31, 2006, with the advice and assistance of defendants, plaintiffs refiled for Chapter 13 bankruptcy in order to stay foreclosure proceedings. Compl. ¶ 65. On May 16, 2006, Mr. Harvey traveled to the Home Savers office and spoke to defendant Simon. Compl.

¶ 70.  Simon told Mr. Harvey that they were going to Queens for a closing and informed him that

the new mortgage principle would be $342,000, rather than the $250,000 Celestine had

promised.  Compl. ¶¶ 71-74.  When Mr. Harvey protested, Simon informed him that he could

back out of the deal but if he did he "would be out on the street."  Compl. ¶ 73-77 (internal

quotations omitted).

The closing attendance sheet lists the following people as present: Borrower - Courtney

Callender, Borrower's Attorney - Jan Alex Dash, Seller – Charles Harvey, Seller's Attorney –

Marvin Blakely, and Realtor – Phil Simon.  Albert Decl. Ex. 3.   Other than Simon and a notary

public not listed on the attendance sheet, Mr. Harvey had never met any of the people present.

Compl. ¶ 82.  While Blakely is listed as the seller's attorney, Mr. Harvey had never spoken to

him before and did not speak to him during the closing.  *See* Compl. ¶¶ 82-87.  Blakely, who

was employed by Home Savers, regularly functioned in a similar capacity as the nominal seller's

attorney in these transactions.  Compl. ¶ 26.

Simon introduced Mr. Harvey to Courtney Callender and explained that Callender would

be "the person whose name will be on the house" while plaintiffs were straightening out their

credit.  Compl. ¶ 82.  The transaction ("the Home Savers transaction" or "the transaction")

required plaintiffs to transfer their deed to Callender, who functioned as a straw buyer.  Compl.

¶¶ 82, 88, Ex. A.  To make the transaction profitable, defendants arranged for Callender to take

out a new mortgage with New York Mortgage in the amount of $342,000.  Compl. ¶ 89.  When

Mr. Harvey asked Simon if he was selling his home, Simon assured him that he was not.  Compl.

¶¶ 83-88.  The HUD-1 settlement statement for the Callendar transaction, however, lists a

contract sale price of $360,000.  Compl. ¶¶ 90-91, Ex. B.  It also states that plaintiffs received

$152,520.79 from the transaction, representing the balance after satisfaction of the La Salle

mortgage and closing fees.  Compl. ¶ 96, Ex B.  In fact, however, plaintiffs received only $12,000 from the transaction.  Compl. ¶ 97.

At the time of this transaction plaintiffs' house was appraised at $360,000 and their mortgage debt was $202,479.21.  Compl. Ex B.  Defendants used the proceeds from the Home Savers transaction to pay off the La Salle Mortgage.  Compl. Ex. B; Harvey Decl. ¶ 12.  The rest of the proceeds were distributed amongst the defendants and their associates.  *See* Compl. ¶¶ 92-97; Albert Decl. Exs. 7, 8.  However, defendants told plaintiffs that they would use the proceeds to make payments on the new mortgage for one year.  Compl. ¶¶ 2, 100-108, Ex. D.

Three days after the closing, plaintiffs signed a contract with the Home Savers Defendants entitled Mutual Understanding Agreement ("the Memorandum").  Compl. ¶ 108, Ex. D.  The Memorandum states that Callender will hold the property in trust for one year during which time plaintiffs will continue to reside in the premises and make all mortgage, maintenance, and real estate tax payments.  Compl. Ex. D.  After the one year period, the Memorandum calls for Callender to transfer title to the property back to plaintiffs and to be released of all liabilities. *Id.*  Defendants paid Callender $10,000 for his services as a straw buyer.  Albert Decl. Ex. 27.

The Memorandum also states that Home Savers will manage and pay plaintiffs' mortgage for one year.  Compl. Ex. D.  The Memorandum lists an unnamed "Mortgage Banking Institution" as the party to whom payments are to be made.  *Id.*  The Memorandum also obligates Home Savers to repair plaintiffs' credit during the one year period.  *Id.*  Defendants told plaintiffs that with the help of their credit services, plaintiffs would be able to take out a new mortgage on more favorable terms and regain title to the property from Callender.  Compl ¶¶ 2, 108, Ex D.  The Memorandum also includes a Resolution Phase Agreement delineating the parties' rights and responsibilities in the case of plaintiffs' default.  Compl. Ex. D.  The

Resolution Phase Agreement states that "any deficiencies by [plaintiffs] will conclude to an immediate sale of the property" by Home Savers. *Id.* Proceeds from the sale are to be used to pay off all existing liens and debts with any remaining funds distributed to the plaintiffs. *Id.* Finally, the Memorandum requires plaintiffs to open a bank account and deposit funds from which the new mortgage would be paid. *Id.*

A couple of days after the closing, Krishna Maharaj, another Home Savers employee, directed plaintiffs to open a checking account at the Astoria Savings Bank in Brooklyn. Compl. ¶¶ 19, 100. Mr. Harvey opened the account with $100 of his own money and listed 946 Fulton Street, Brooklyn, N.Y., Home Savers' address, for purposes of the account. Compl. ¶¶ 101-02. He also gave Simon and Celestine power of attorney over this account and signed fifteen blank checks that Maharaj told him would be used by defendants to pay the mortgage each month. Compl. ¶¶ 103-106, Ex. C. Defendants, however, made only two payments and then let the mortgage lapse into default. Compl. ¶ 114; *see* Albert Decl. Ex. 10, 13.

At the end of the one year period, plaintiffs were unable to assume the $342,000 Callender mortgage or take out a new mortgage on more favorable terms. Compl. ¶ 110. On June 21, 2007, plaintiffs received an eviction notice from Callender. Compl. ¶ 111, Ex. E. On December 3, 2007, RMS Properties, New York Mortgage's successor in interest, commenced foreclosure proceedings on Callender and plaintiffs. Compl. ¶¶ 34, 114.

Plaintiffs have settled with all defendants except for Home Savers, Simon, Celestine, and Blakeley. Plaintiff's title to their home was restored as part of the settlement agreements. Harvey Decl. ¶ 15. At the time of the settlement, the house was appraised at $280,000. Harvey Decl. ¶ 16. Plaintiffs took out three new loans to pay for the house. Albert. Decl. ¶¶ 7, 14-15. The first loan is an adjustable rate mortgage with the Lower East Side People's Federal Credit

Union ("Lower East Side") in the amount of $125,000 with an initial interest rate of 4.75%.

Harvey Decl. ¶ 17. Because of the litigation, plaintiffs were unable to obtain a fixed-rate

mortgage loan. Albert Decl. ¶ 11. Plaintiffs also took out a personal loan with Lower East Side

for $25,000 with a 5% fixed interest rate, and a third loan with an organization called FJC

secured by a lien on the house worth $10,000 with a fixed interest rate of 2%. Albert Decl.

¶¶ 14-15.

### Discussion

Although the allegations of a complaint pertaining to liability are deemed admitted upon

entry of a default judgment, allegations relating to damages are not. *See Greyhound*

*Exhibitgroup, Inc., v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992), *cert. denied*, 506

U.S. 1080 (1993). A court, however, retains the discretion to determine whether a final default

judgment is appropriate. *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993). Even

after a defendant has defaulted, "[a] plaintiff must . . . establish that on the law it is entitled to the

relief it seeks, given the facts as established by the default." *U.S. v. Ponte*, 246 F. Supp. 2d 74,

76 (D. Me. 2003) (citation omitted). *See also Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65

(2d Cir. 1981) (recognizing the court's authority, even after default, to determine whether

plaintiff has stated a cause of action).

If the facts as alleged give rise to liability, a court must ensure that there is a basis for the

damages sought by a plaintiff before entering judgment in the amount demanded. *See Fustok v.*

*Conti Commodity Services, Inc.*, 873 F.2d 38, 40 (2d Cir. 1989). A court may make this

determination based upon evidence presented at a hearing or upon a review of detailed affidavits

and documentary evidence. *See* FED. R. CIV. P. 55(b)(2); *Action S.A. v. Marc Rich & Co., Inc.*,

951 F.2d 504, 508 (2d Cir. 1991); *Fustok*, 873 F.2d at 40. Defendants have not submitted any opposition to plaintiffs' motion.

### A. TILA and HOEPA

Plaintiffs first seek statutory and enhanced damages for the Home Savers Defendants' alleged violations of TILA and HOEPA pursuant to 15 U.S.C. § 1601, *et seq*. For the following reasons, I respectfully recommend that this aspect of plaintiffs' motion be denied.

TILA was enacted "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998) (quoting 15 U.S.C. § 1601). The Act requires creditors to clearly disclose information—such as finance charges, annual percentage interest rates, and the borrower's rights—and provides borrowers with civil remedies for a creditor's failure to do so. *Id.* In 1994, HOEPA amended TILA to provide additional protections for a specified class of loans referred to as high-cost mortgage loans. *Macheda v. Household Fin. Realty Corp. of New York*, 631 F. Supp. 2d 181, 185 (N.D.N.Y. 2008).

These statutory protections apply only to credit transactions. Plaintiffs' complaint, however, describes a transaction that, at least in form, appears to be a conveyance. Compl. ¶ 88, Ex A. As alleged in the complaint, the Home Savers transaction required plaintiffs to sign a quitclaim deed transferring their ownership interest to Callender. *Id.* Nevertheless, plaintiffs argue that the transaction satisfies the requirements of TILA and HOEPA because, under New York State law, the transaction constitutes an equitable mortgage. As an equitable mortgage,

plaintiffs argue, the Home Savers transaction qualifies as a credit transaction under TILA and HOEPA.

Under New York State's equitable mortgage doctrine, "a court of equity will treat a deed, absolute in form, as a mortgage, when it is executed as security for a loan." *Leonia Bank v. Kouri*, 772 N.Y.S.2d 251, 254 (1st Dep't 2004) (quoting *Peugh v. Davis*, 96 U.S. 332, 336 (1877)); *see also Mooney v. Byrne*, 163 N.Y. 86, 91-92 (1900). Section 320 of New York Real Property Law codifies the equitable mortgage doctrine and requires a court to find a mortgage where circumstances indicate that a conveyance was intended "only as a security in the nature of a mortgage." *Leonia Bank*, 772 N.Y.S.2d at 254 (quoting N.Y. REAL PROP. LAW § 320). Numerous courts have looked to state law to define transactions similar to the one at issue here and relied on the equitable mortgage doctrine to find TILA and HOEPA applicable. *See e.g.*, *Jonhson v. Novastar Mortgage, Inc.*, 698 F. Supp. 2d 463, 468-71 (D.N.J. 2010) (finding TILA and HOEPA applicable to a sale-leaseback transaction under New Jersey's equitable mortgage doctrine); *Jones v. Rees-Max, LLC*, 514 F. Supp. 2d 1139, 1145-46 (D. Minn. 2007) (reaching a similar result under Minnesota's equitable mortgage doctrine).

The circumstances surrounding the Homes Savers transaction indicate that plaintiffs transferred their deed as security for a loan and without any intent to convey title. The defendants presented the transaction to plaintiffs as a refinancing and assured Mr. Harvey that he was not selling his house. Compl. ¶¶ 2, 61-64, 84. In addition, plaintiffs continued to reside in the property and were responsible for paying taxes and maintenance fees. Compl. ¶ 117, Ex. D. Finally, defendants told plaintiffs that the proceeds of the transaction would be used to make payments on the Callender mortgage and that title to the property would be returned after

plaintiffs were able to take out a new mortgage on more favorable terms. Compl. ¶¶ 102-08, Ex. D.

However, even if the Home Savers transaction is construed as an extension of credit, plaintiffs fail to state a claim under TILA and HOEPA against these particular defendants. TILA and HOEPA impose disclosure obligations only on the creditors of the relevant credit transaction. *Cetto v. LaSalle Nat'l Assoc.*, 518 F.3d 263, 268-70 (4th Cir. 2008); *Mauro v. Countrywide Home Loans*, 727 F. Supp. 2d 145, 157 (E.D.N.Y 2010). The statute defines a creditor as "the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement." 15 U.S.C. § 1602(f). Under this definition, a party who merely arranges a credit transaction, such as a mortgage broker, is not a creditor for the purposes of TILA or HOEPA. *See Cetto*, 518 F.3d at 277; *Robey-Harcourt v. Bencorp Fin. Co.*, 326 F.3d 1140, 1142 (10th Cir. 2003); *Mauro*, 727 F. Supp. 2d at 157 n.13; *Viernes v. Executive Mortgage, Inc.*, 372 F. Supp. 2d 576, 582-83 (D. Haw. 2004).

Plaintiffs' complaint indicates that the Home Savers Defendants agreed to "arrange" mortgage refinancing and "manage" plaintiffs' payments by applying proceeds derived from the Home Savers transaction to the Callender mortgage. Compl. ¶¶ 63, 108. Nevertheless, plaintiffs claim the Memorandum indicates that defendants functioned as creditors in the transaction. Specifically, plaintiffs argue that because Callender had no rights to the property and Home Savers had the right to sell the property in the event of plaintiffs' default, Home Savers, Simon and Celestine were the true creditors. I disagree.

While the Home Savers Defendants structured the transaction, plaintiffs' obligation was to a third party mortgage institution, New York Mortgage and its successors in interest. Even if

the Home Savers Defendants had the right to sell the property in order to satisfy plaintiffs' debt, they were not plaintiffs' creditors. Because the Home Savers Defendants were not plaintiffs' creditors, they were not subject to the disclosure obligations of TILA and HOEPA. Accordingly, I respectfully recommend that plaintiffs' TILA and HOEPA claims be dismissed.

### B. RESPA

For the reasons enumerated above, plaintiffs' RESPA claim against the Home Savers Defendants should also be dismissed. RESPA regulates practices relating to "federally related mortgage loan[s]." 12 U.S.C. §§ 2602(1), 2603(a). Plaintiffs' RESPA claim is premised upon the Home Savers Defendants' status as "creditor[s], as defined in section 1602(f)." 12 U.S.C. §2602(1)(B)(iv)) (referencing TILA's definition of creditor); *see* Compl. ¶¶ 132-134. Because the Home Savers Defendants do not qualify as creditors under TILA or HOEPA, they also do not qualify as creditors under RESPA. Accordingly, I respectfully recommend that plaintiffs' RESPA claim be dismissed.

### C. RICO

### i. Liability

Plaintiffs also allege that defendants Home Savers, Phil Simon, Garth Celestine, and Marvin Blakely violated RICO by engaging in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) and by conspiring with one another to violate RICO in contravention of 18 U.S.C. § 1962(d). Plaintiffs estimate their actual damages from the RICO violation to be $146,987.79. This figure is comprised of the $157,800.79 of equity that defendants stripped from their home, as well as $1,187 plaintiffs paid for appraisals, bankruptcy fees, and deposits in furtherance of the transaction, offset by the $12,000 plaintiffs received from the Home Savers transaction. Pls.' Mem. of Law in Support of Mot. for Default J. ("Pls.' Mem. of Law") at 2,

Docket Entry 151; Pl's Supplemental Letter ("Pls.' Supp. Letter") at 2, Docket Entry 158.

Plaintiffs seek to treble these damages, pursuant to 18 U.S.C. § 1964, for a total of $440,963.37,

and to hold all defendants jointly and severally liable. For the following reasons, I recommend

that plaintiffs' motion be granted subject to the modifications described below.[2]

To establish a civil RICO claim for damages under § 1964, a plaintiff must show: "(1) a

violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3)

that the injury was caused by the violation of Section 1962." *De Falco v. Bernas*, 244 F.3d 286,

305 (2d Cir. 2001) (quoting *Pinnacle Consultants, Ltd. v. Leucadia Nat'l Corp.*, 101 F.3d 900,

904 (2d Cir. 1996)). Sections 1962(c) and (d) make it unlawful for a defendant to conduct or

participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity

or to conspire to do so. *See Salinas v. United States*, 522 U.S. 52, 62-63; *De Falco,* 244 F.3d at

305-06; *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 453 (S.D.N.Y. 1998). An enterprise is

any legal entity or group of persons associated together in fact, for the "common purpose of

engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). The

pattern element is established through proof of at least two related acts of racketeering activity

that either "amount to or pose a threat of continued criminal activity." *United States v. Alkins*,

925 F.2d 541, 551 (2d Cir. 1991) (quoting *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492

U.S. 229, 238 (1989)). Acts may be related based on temporal proximity, common goals,

similarity of methods, or repetitions. *Alkins*, 925 F.2d at 551. A defendant is liable as a

principle if he participates in the operation or management of the enterprise or as a conspirator if

---

[2] Plaintiffs' motion for damages under RICO is premised on defendants' alleged predicate acts of mail fraud and unlawful debt collection pursuant to 18 U.S.C. §§ 1961 and 1962. Because I find that plaintiffs are entitled to RICO damages based on the predicate acts of the mail fraud, I do not reach plaintiffs' contention that defendants also committed acts of unlawful debt collection.

he simply knows about and agrees to facilitate the unlawful activity. *See Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993); *Baisch v. Gallina*, 346 F.3d 366, 376-77 (2d Cir. 2003).

The RICO statute defines "racketeering activity" by reference to a number of specifically enumerated crimes, including mail and wire fraud. 18 U.S.C. § 1961(1)(B). A plaintiff alleging a RICO violation based on mail or wire fraud must demonstrate that defendants devised or engaged in a scheme to defraud that was furthered by use of mail or interstate wire communications. *Phoenix v. Bond*, 553 U.S. 639, 647 (2008). "The gravamen of the offense is the scheme to defraud and any mailing that is incident to an essential part of the scheme or artifice to defraud satisfies the mailing element, even if the mailing itself contains no false information." *Id.* (internal quotations and citations omitted). Each mailing constitutes an individual act of mail fraud, several of which may combine to form a pattern of racketeering activity. *See Id.* at 648.

A violation of the mail or wire fraud statutes must be plead with specificity pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987). Thus, a complaint must particularize the circumstances constituting the fraud. *Id.* Malice, knowledge, or intent, however, may be averred generally. *Id.* In addition, "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation." *Id.* However, a plaintiff need not show that each defendant made a material misrepresentation or that every defendant personally used the mail or wires. *See OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 354 F. Supp. 2d 357, 375-76 (S.D.N.Y. 2005) ("[I]t is no great leap to find that one who assists in the fraud also conducts or participates in the conduct of the affairs of the enterprise.") (quoting *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004));

14

*Sumitomo*, 995 F. Supp. at 457 ("The defendant need not personally initiate or receive the mailing to be liable for mail fraud, so long as the use of the mails by others was reasonably foreseeable.") (internal quotations omitted). So long as a defendant intends to facilitate or participate in the fraudulent scheme and acts with knowledge that the mail or wires will follow in the ordinary course of business, he may be held liable. *See id*.

In this case, the facts alleged in the complaint establish that the Home Savers Defendants violated RICO by conducting the affairs of an association-in-fact enterprise comprised of Home Savers, Simon, Celestine, and other defendants who have since settled with plaintiffs, through a pattern of racketeering activity. Defendants utilized the enterprise to defraud plaintiffs and other homeowners facing foreclosure. The complaint adequately alleges that defendants associated together for the purpose of targeting distressed homeowners who had fallen behind in their mortgages in order to fraudulently take title to their property and strip them of their equity. Compl. ¶¶ 2-4, 12-26, 82-90, 110-112, 153-161. The Home Savers Defendants fraudulently misrepresented the nature of the transaction they were proposing to plaintiffs, falsely asserted that they would repair plaintiffs' credit, fabricated much of the information on the loan and title documentation, and falsely claimed that they would use the loan proceeds resulting from the transaction to make monthly payments on the new mortgage. Compl. ¶¶ 57-62, 83-86, 89-91, 96-97. Further, these defendants used the mails and interstate wires to transmit the fraudulent loan documents to plaintiffs and their mortgage lenders in furtherance of the scheme. Compl. ¶¶ 101-105, 167-71. Finally, the complaint alleges that the Home Savers Defendants perpetrated similar schemes against multiple victims. Compl. ¶¶ 171-192. The repetitive nature and similarity of methods defendants employed in these schemes demonstrates a continuing threat of criminal activity.

Although plaintiffs' complaint spends less time delineating Blakely's involvement than it does on the acts of the others, Blakely's fraudulent intent and participation in the scheme as a conspirator may be inferred from the circumstances surrounding the Home Savers transaction. While the closing attendance sheet lists Blakely as Mr. Harvey's attorney at the closing, Blakely failed to truthfully advise Mr. Harvey about the nature of the transaction when Mr. Harvey voiced his concerns. Compl. ¶ 83-87; Albert Decl., Docket Entry 148, Ex. 3. Moreover, the disparity indicated in the loan documents between the amounts plaintiffs received, versus the amounts Blakely received as plaintiffs' attorney, adequately demonstrates Blakely's knowledge and actions in furtherance of the scheme. Compl. ¶¶ 26-27, 96-97, Ex. B. Plaintiffs' supporting documentation indicates that Blakely received two checks made out to "Marvin Blakely, As Attorney" from New York Mortgage: the first for $22,000 and the second for $110,231. Albert Decl. Ex. 7. Mr. Harvey signed a document authorizing the $110,231 to be deposited in an account controlled by Home Savers. Albert Decl. Ex. 8 (document signed by Mr. Harvey authorizing funds to be deposited with 527 Maple Court Corporation); Ex. 15 at 25 (plea allocution of defendant Celestine acknowledging that he and defendant Simon owned and controlled 527 Maple Court Corporation). The HUD-1 settlement statement, however, states plaintiffs received $152,520.79 from the transaction. Compl. Ex. B. Given Blakely's role and the disparity between these amounts, Blakely's conscious involvement as a conspirator may be fairly inferred.

ii.     *Damages*

Plaintiffs seek $145,800.79, representing the equity defendants stripped from plaintiffs' home as a result of the Home Savers transaction. Plaintiffs have submitted an appraisal dated April 14, 2006, approximately one month prior to the date of the Home Savers transaction, that

values plaintiffs' home at $360,000. Albert Decl. Ex. 2. The settlement statement for the Home Savers transaction indicates that the plaintiffs owed a balance of $202,199.21 on their LaSalle mortgage. Albert Decl. Ex. 6. Accordingly, at the time of the Home Savers transaction, plaintiffs had $157,800.79 in equity in their home. Plaintiffs, however, received only $12,000 from the transaction, thus suffering a net loss of equity in the amount of $145,800.79. Harvey Decl. ¶ 11. Plaintiffs also paid a total of $1,187 for incidental fees to facilitate the Home Savers transaction, comprised of $900.00 for three appraisals of their home, a $186 filing fee to initiate their second bankruptcy action, and a $100 deposit to open the Astoria bank checking account that defendants falsely claimed would be used to pay the Callender mortgage. Harvey Decl. ¶¶ 6, 7, 13. Plaintiffs calculate these incidental fees as totaling $1,187.[3]

"[T]he purpose of a civil RICO award is to return the plaintiff to the same financial position he would have enjoyed absent the illegal conduct." *Trs. of Plumbers and Pipefitters Nat. Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134, 1146 (S.D.N.Y. 1995). In the case of fraud, the general rule is that a plaintiff may recover for the out-of-pocket losses caused by defendant's fraud reduced by any benefit the plaintiff obtained as a result of the transaction. *See First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994). A court may not award damages for lost profits or for the benefit of an alternative opportunity a plaintiff might or could have pursued in lieu of the fraudulent transaction. *World Wrestling Entm't, Inc. v. Jakks Pacific, Inc.*, 530 Supp. 2d 486, 519-21 (S.D.N.Y. 2006). Such losses are inherently speculative and lack adequate causational proof. *Id.*; *Three Crowns Ltd. P'ship v. Salomon Bros., Inc.*, 906 F. Supp. 876, 891-92 (S.D.N.Y. 1995); *see also First Nationwide*, 27 F.3d at 769.

---

[3] It appears the actual amount of incidental fees is $1,186. I ignore this one dollar discrepancy for the sake of consistency and simplicity.

Plaintiffs' $146,987.79 damages figure is based on the equity the Home Savers Defendants stripped from their home, plus the incidental fees of the transaction, minus the money plaintiff received from the transaction. This amount, however, fails to account for the benefit plaintiffs received as a result of the transaction. Specifically, as a result of the Home Savers transaction, plaintiffs remained in their home without making any mortgage or rental payments until they entered into three new loans after settling with the non-defaulting defendants. To arrive at an accurate damages figure, the value of this benefit must be taken into account.

At the time that plaintiffs entered into the Home Savers transaction, plaintiffs' monthly mortgage payment to La Salle bank was $1,102.62. Compl. ¶ 43; Pls.' Supp. Letter at 2. Plaintiffs were relieved from making any mortgage payments on May 16, 2006, the date of the Home Savers transaction, through July 30, 2009, the date plaintiffs entered into their new loans. Compl. ¶ 70; Albert Decl. ¶ 6; Pls.' Supp. Letter at 2. Thus, as a result of the fraudulent transaction, plaintiffs received the benefit of residing in their home for thirty-seven months without having to make their mortgage payments. Multiplying the $1,102.62 mortgage payment by thirty-seven months yields a benefit to plaintiffs of $40,796.94.

Plaintiffs take issue with the Court's use of the La Salle mortgage payment figure in its value calculation, contending that if they had not entered into the transaction with defendants they would have "obtained less expensive housing or refinanced at a lower rate." Pls.' Supp. Letter at 2. Instead, plaintiffs advocate using their current $843.70 monthly payment as an alternative means of measuring the benefit to plaintiffs of living in their home without paying their mortgage. *Id.* I find plaintiffs' argument untenable. When plaintiffs entered into the Home Savers transaction, they were on the eve of foreclosure and unlikely to find alternative

refinancing.  Without the transaction, plaintiffs would have had to find a way to make their mortgage payments at the original, higher rate or they would have lost their house.  Moreover, as discussed below, plaintiffs' current mortgage payment reflects benefits plaintiffs obtained as a result of this lawsuit that they would not have realized if they had not been defrauded and brought suit.

Plaintiffs also argue that, although they did not make mortgage payments for thirty-seven months, their damages should not be reduced because they made monthly $1,200 payments totaling $32,400 to their attorney's escrow account during the pendency of the litigation.  Harvey Decl. ¶ 22; Pls.' Supp. Letter at 2.  This money was used by plaintiffs to pay their attorneys' fees and for the transaction fees associated with their new loans.  Pls.' Supp. Letter at 4.  I decline to take these payments into account.  First, plaintiffs are entitled to recover their attorney's fees pursuant to RICO.  *See Stochastic Decisions Inc. v. DiDomenico*, 995 F.2d 1158, 1167 (2d Cir. 1993); 18 U.S.C. § 1964(c).  Nor are the transaction fees compensable.  As discussed above, to stay in their home, plaintiffs would have been required to find a refinancing transaction and pay similar fees.  Moreover, the fees plaintiffs paid as part of the Home Savers transaction are part of the damages I have already calculated.  Thus, including the additional fees associated with plaintiffs' current financing would be duplicative.

Accordingly, I calculate plaintiffs' actual damages as follows: $157,800.79 of equity stripped from their house, plus $1,187 in Home Savers transaction fees, less $12,000 plaintiffs received from the transaction, and less $40,796.94 for the value of living in the house without mortgage or rental payments, for a total $106,190.85.  This amount should be trebled, pursuant to 18 U.S.C. § 1964(c), for a total of $318,572.55, and defendants should be held jointly and severally liable for this amount.

*D.  Other Claims*

Plaintiffs seek the same amount in actual damages under multiple theories.  Because I find that plaintiffs are entitled to actual damages under their RICO claim, I do not reach their claims under the Fair Housing Act, New York Deceptive Practices Act, civil conspiracy, or conversion.  I discuss defendants' liability for common law fraud and under the Civil Rights Acts, however, because it is relevant to plaintiffs' motion for punitive damages.

   *i.      Common Law Fraud*

Plaintiffs' complaint adequately establishes defendants' liability for common law fraud. "Under New York law, the elements of common law fraud are a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." *Chanayil v. Gulati*, 169 F.3d 168, 171 (2d Cir. 1999) (internal quotations omitted). As discussed above, the complaint establishes that defendants made multiple material misrepresentations in order to strip plaintiffs of their title and equity in their home, and that plaintiffs relied on these misrepresentations when entering into the Home Savers transaction.

   *ii.     Civil Rights Claims*

Plaintiffs' complaint also establishes the liability of Home Savers, Celestine, and Simon under 42 U.S.C. §§ 1981 and 1982 by virtue of defendants' intentional targeting of minority communities—and plaintiffs specifically—for their fraudulent foreclosure rescue scheme. Compl. ¶¶ 196-216.[4]  "Sections 1981 and 1982 prohibit discrimination in various financial transactions, including the making and enforcing of contracts and purchasing real and personal property." *Barkley v. Olympia Mortgage Co.*, 2007 WL 2437810, at *10 (E.D.N.Y. Aug. 22, 2007) (citing 42 U.S.C. §§ 1981, 1982).  To state a claim under either section, a plaintiff must allege facts in support of the following elements: "(1) that the plaintiff is member of a racial

[4] Blakely, while named in plaintiffs' fraud claim, is not named in plaintiffs' civil rights claims.

minority; (2) that the defendant intended to discriminate on the basis of race, and (3) that the discrimination concerned one or more activities enumerated in section 1981 or 1982." *Id.*; *see also Mian v. Donaldson, Lufkin & Jenrette Sec. Co.*, 7 F.3d 1085, 1087 (2d Cir. 1993); *Gonzalez v. Home Ins. Co.*, 909 F.2d 716, 719-20 (2d Cir. 1990).

Courts have held that targeting racial minorities for unfair treatment with respect to housing transactions is sufficient to establish discriminatory intent. *See e.g., Barkley*, 2007 WL 2437810, at *11-12; *Hargraves v. Capital City Mortgage Co.*, 140 F. Supp. 2d 7, 20-21 (D.D.C. 2000). Once a plaintiff establishes that a defendant has targeted a racial minority for unfair dealing, it is not necessary to demonstrate that the defendant offered "more favorable terms to anyone other than the targeted class." *Hargraves*, 140 F. Supp. 2d at 20. In this case, defendants focused their unfair business dealings on African American communities, solicited minority individuals by phone and door-to-door, and engaged in racially targeted advertising by taking out ads in publications with a primarily African-American readership. Compl. ¶¶ 197-203. These actions suggest an intent to discriminate on the basis of race and subject defendants Home Savers, Simon, and Celestine to liability under Sections 1981 and 1982.

iii.   *Punitive Damages*

Plaintiffs seek punitive damages both for defendants' civil rights violations and for defendants' common law fraud in an amount equal to three times their actual damages. "Punitive damages may be awarded in a civil rights claim where a defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Tolbert v. Queens Coll.*, 242 F.3d 58, 77 (2d Cir. 2001) (emphasis removed) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Similarly, punitive damages may be awarded where a defendant has committed a "gross, wanton, or willful fraud"

or has otherwise engaged in "morally culpable conduct to an extreme degree." *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 371 (2d Cir. 1988) (quoting *Borkowski v. Borkowski*, 39 N.Y.2d 982, 983 (1976)); *see also Walker v. Sheldon*, 10 N.Y.2d 401, 406 (1961) (noting that defendants who "deliberately and cooly engage in a far-flung fraudulent scheme, systematically conducted for profit, are very much more likely to pause and consider the consequences if they have to pay more than the actual loss suffered by an individual plaintiff."). The purpose of punitive damages is both to punish the defendant and deter him and others from engaging in comparable conduct. *Wade*, 461 U.S. at 54. In making a punitive damages award, a court should be mindful not to make an award that is greater than necessary to effectuate these goals. *Colbert v. Furumoto Realty*, 144 F. Supp. 2d. 251, 257 (S.D.N.Y. 2001) (internal quotations omitted).

Plaintiffs have established that an award of punitive damages would be proper in this case. Defendants solicited their victims by professing a false desire to help them and an insincere religious motivation. Compl. ¶¶ 55-56. They intentionally targeted minority victims, evincing a willful and callous disregard for plaintiffs' federally protected civil rights. *See* Compl. ¶¶ 202-03. Moreover, defendants preyed upon particularly vulnerable victims: struggling homeowners, desperate to find a way to keep their homes in the face of imminent foreclosure. Albert Decl. Ex. 15 at 22, Ex. 23. Finally, defendants' scheme was so successful that it generated upwards of ten million dollars in fraudulent loans and spawned multiple lawsuits. *See* Compl. ¶¶ 174-192 (citing to and discussing other lawsuits involving the Home Savers scheme); Albert Decl. Ex. 15 at 26.

The amount of punitive damages plaintiffs seek, however, is excessive. Plaintiffs seek three times their actual damages, which would total $318,572.55. Plaintiffs' damages have

already been trebled under RICO. Given the punitive nature of RICO's trebling provision, an additional punitive award risks punishing defendants twice for the same conduct. *See Genty v. Resolution Trust Corp.*, 937 F.2d 899, 914 (3rd Cir. 1991) (holding that the "the treble damages provision serve[s] a predominantly punitive purpose"); *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1141 (5th Cir. 1988) ("We hold that the portion of RICO damages in excess of actual damages is penal.") (*vacated on other grounds sub nom. Fryar v. Abell*, 492 U.S. 914 (1989)); *Bingham v. Zolt*, 823 F. Supp. 1126, 1135 (S.D.N.Y. 1993) (reaching a similar holding, but noting that "it appears to be an open question in [the Second] Circuit as to whether RICO's treble damages provision is in fact punitive in nature."). On the other hand, some amount of additional punitive damages is appropriate to punish and deter conduct that is separate and distinct from the conduct underlying the RICO claim. Here, the intentional targeting of minority victims, and of victims in desperate financial straits, warrants some award of punitive damages in addition to the trebling under RICO. *Cf.* U.S. Sentencing Commission, Guidelines Manual § 3A1.1 (providing for upward adjustments to a criminal defendant's offense level when his victims are vulnerable or targeted on the basis their race). Mindful of these competing considerations and that a punitive damage award may not exceed that which is necessary to deter and punish, I respectfully recommend that plaintiffs be awarded punitive damages in an amount equal to their actual damages, $106,190.85.

### E. Set Off

Prior to filing this motion, plaintiffs entered into settlement agreements with all other defendants. Docket Entries 128, 139, 143. Since a plaintiff may not recover twice for same injury, the final damages award must be set off by the value of these agreements. *See Singer v. Olympia Brewing Co.*, 878 F.2d 596, 600 (2d Cir. 1989). However, the value of these

settlements should be deducted from the amount of plaintiffs' damages only after they have been

trebled pursuant to RICO. *See id.* at 601; *In re Crazy Eddie Secs. Litig.*, 948 F. Supp. 1154, 1169

(E.D.N.Y. 1996); *In re Nat'l Mortgage Equity Corp. Mortgage Pool Secs. Litig.*, 636 F. Supp.

1138, 1151-52 (C.D. Cal. 1986).

On April 13, 2010, plaintiffs entered into a $10,000 settlement with Ophelia Ray. Docket

Entry 143. In addition, on September 25, 2009, plaintiffs entered into a confidential settlement

with New York Mortgage, Black Acre Title, and RMS Residential Properties, (collectively "the

institutional defendants"). Docket Entry 128.[5] As a result of this settlement, plaintiffs regained

title to their house, secured a reduction in the principle on the $342,000 Callender mortgage to

$210,000, and received a total of $53,000. Harvey Decl. ¶ 14-15; Pls.' Supp. Letter at 4. Thus,

the aggregate value of plaintiffs' settlement with the institutional defendants totals $185,000.[6]

Finally, on February 24, 2010, plaintiffs entered into a settlement with Krishna Maharaj. Docket

Entry 139. However, because Maharaj failed to make any payments, Judge Gleeson issued an

order directing the Clerk of the Court to enter a judgment in favor of plaintiffs for $20,000.

Saylor Decl. ¶¶ 2-5, Docket Entry 160-1; Order dated February 18, 2011. Since plaintiffs have

failed to recover any monies from Maharaj and are unlikely to do so, I recommend that the

Maharaj settlement not be set off against plaintiffs' default damages award. However, should

---

[5] Although it does not appear to be reflected on the docket sheet, plaintiffs also settled with Courtney Callender. Pls.' Mem. of Law, Docket Entry 151, at 16. I infer from plaintiffs' submissions that the Callender settlement did not result in any additional financial benefit to plaintiffs.

[6] Plaintiffs advocate calculating the value of the settlement by subtracting $160,000, the principle balance of the three loans they took out to regain title to the house, from the appraisal value of the home at the time of settlement, $280,000, to arrive at an equity calculation of $120,000. Pls.' Supp. Letter at 3. However, plaintiffs' damages have been calculated by reference to the value of the house at the time of the fraudulent Home Savers transaction. Plaintiffs cannot have it both ways. To calculate damages for a fluctuating commodity, the Court may use either the value of the property at the time the injury occurred or the value at a later date, and cannot use a higher value to calculate damages and then a lower value to calculate amounts to be set off against those damages. Moreover, had plaintiffs remained current on their original mortgage, they would have sustained the same loss in equity reflected in the second appraisal as a result of the overall decline in the value of the real estate. In any event, I recommend calculating the value of plaintiffs' settlements with these institutional defendants by reference to the amount of principle these non-defaulting defendants forgave on the Callender mortgage as the most logical approach.

plaintiffs recover any amount from Maharaj, the amount they are entitled to recover against the defaulting defendants should be correspondingly reduced.

Accordingly, I recommend that plaintiffs' total damages award be set off by a total of $195,000, consisting of $132,000 in reduced mortgage principle owed, plus $53,000 obtained from the institutional defendants, plus $10,000 from Ray. Plaintiffs' RICO and punitive damages award come to $424,763.40. When the cumulative value of plaintiffs' settlements is deducted from the amount plaintiffs' total damages award, the sum comes to $229,763.40.

*F. Interest and Attorneys' Fees*

Plaintiffs also seek pre-judgment interest on their New York State law claim, pursuant to N.Y. C.P.L.R. § 5001, *et seq.* and post-judgment interest pursuant to 28 U.S.C. § 1961(a). Plaintiffs are only entitled to pre-judgment interest on their actual fraud damages and not on any punitive damage award. *Delulio v. 320-57 Co.*, 472 N.Y.S.2d 379, 381 (1st Dep't 1984). Plaintiffs, however, are entitled to post-judgment interest on their entire damages award. 28 U.S.C. § 1961(a). Accordingly, I respectfully recommend that plaintiffs be awarded prejudgment interest at the rate of 9% per annum on their actual damages in the amount of $106,190.85, starting from May 16, 2006, the date of the fraudulent closing, and running until the date of the final judgment. I also recommend that plaintiffs be awarded post-judgment interest on their entire award at the statutory interest rate to be calculated by the Clerk of the Court at the time of judgment.

Finally, plaintiffs are entitled to reasonable attorneys' fees and costs pursuant 18 U.S.C. § 1964(c) as well as 42 U.S.C. § 1988 and request permission to submit an application for fees and costs supported by their contemporaneous time records. I recommend that this aspect of their motion be granted.

## Conclusion

For the reasons set forth above, I respectfully recommend that judgment be entered against defendants Home Savers, Celestine, Simon, and Blakely, jointly and severally, in the amount of $229,763.40. Further, I recommend that the plaintiffs be awarded pre-judgment interest at the rate of 9% per annum on the amount of $106,190.85, starting from May 16, 2006 and running until the date of the final judgment and post-judgment interest at the rate set by 28 U.S.C. § 1961 on the entire judgment amount. Interest is to be calculated by the Clerk of the Court at the time of judgment.

I also recommend that plaintiffs be awarded reasonable attorneys' fees and costs. Plaintiffs' submission detailing these amounts together with supporting documentation should be filed by March 24, 2011.

Any objections to the recommendations made in this Report must be filed within fourteen days of this Report and Recommendation and, in any event, on or before March 21, 2011. Failure to file timely objections may waive the right to appeal the District Court's Order. See 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a); *Small v. Sec'y of Health & Human Servs*., 892 F.2d 15, 16 (2d Cir. 1989). Plaintiffs are hereby directed to serve a copy of this Report upon defendants at their last known address, and to file proof of service with the Court.

_____/s/_____

**STEVEN M. GOLD**
**United States Magistrate Judge**

Brooklyn, New York
March 3, 2011

*U:\BW 2010\Home Savers\Home Savers Final.doc*